IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| THERMASTEEL INC., | ) | |
| | ) | |
| and | ) | AMENDED |
| | ) | COMPLAINT |
| ADI BEN-SENIOR | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 7:19-cv-00492- |
| | ) | EKD |
| ROBERT W. DAY, | ) | |
| | ) | |
| | ) | |
| R.W. DAY AND ASSOCIATES, INC., | ) | |
| | ) | |
| | ) | |
| TULIP THERMASTEEL, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| ——————————————————— | ) | |

## **PARTIES**

1) Plaintiffs
   a. Thermasteel, Inc
      i. 609 West Rock Road, Radford, VA 24141
      ii. (540) 633-5000
   b. Adi Ben-Senior
      i. 609 West Rock Road, Radford, VA 24141
      ii. (540) 633-5000

2) Defendants
   a. Robert W. Day
      i. 9815 Myrtle Lane, Baton Rouge, LA 70810
   b. R.W. Day and Associates, Inc.
      i. c/o Registered Agent, Robert Day 9815 Myrtle Lane, Baton Rouge, LA 70810
   c. Tulip Thermasteel, LLC
      i. c/o Registered Agent, Randy Roussel Phelps Dunbar 400 Convention St., Ste. 1100, Baton Rouge, LA 70802
      ii. 4005 Nicholson Drive, 2nd Floor, Baton Rouge, LA 70808

## JURISDICTION

This district court and this Court have subject matter jurisdiction over this case pursuant to 28 U.S.C. §1332(a) because the amount in controversy exceeds $75,000.00 and Plaintiff Thermasteel, Inc. is a Delaware corporation with a principal place of business in Virginia, and its registered agent for service of process is in Virginia. Plaintiff Adi Ben-Senior is foreign citizen who is a resident of Virginia. Defendant Robert W. Day is a resident of Louisiana. Defendant R.W. Day and Associates, Inc. is a Louisiana corporation with a principal place of business in Louisiana, and its registered agent for service of process is in Louisiana. Tulip Thermasteel, LLC is a Louisiana Limited Liability Company, and its registered agent for service of process is in Louisiana. Robert Day, a citizen of Louisiana, is the sole member of Tulip Thermasteel, LLC.

TO THE HONORABLE JUDGES OF THIS COURT:

COMES NOW the Plaintiffs, Thermasteel, Inc. (hereafter "Thermasteel") and Adi Ben-Senior (here after "Ben-Senior"), and for their causes of action against the Defendants, state as follows:

## FACTS

1.     At all relevant times herein, Thermasteel R.P. Ltd., ("T.R.P. Ltd.") was a corporation which had its principal place of business and primary manufacturing facilities located in the city of Radford, Virginia.

2.     T.R.P. Ltd. engineered and then manufactured composite structural insulated building panels for a variety of commercial and residential building projects ("Thermasteel panels").

3.      T.R.P. Ltd. regularly operated under the trade name "Thermasteel" including the operation and publishing to the world wide web of a company website.

4.      In 2016, T.R.P. Ltd. was made available for purchase by its owners.

5.      In 2016, Ben-Senior entered into negotiations with T.R.P. Ltd. for the purchase of the company.

6.      While Ben-Senior had the expertise needed to engineer, manufacture, and market the composite building panels produced by T.R.P. Ltd., Ben-Senior did not have sufficient capital to pay the purchase price of T.R.P. Ltd.

7.      During this time, T.R.P. Ltd. made the decision that should it not be purchased by a third party, it would soon shut its doors and cease operations.

8.      As part of these negotiations, Ben-Senior agreed to operate the Radford manufacturing facilities of T.R.P. Ltd such that the company would remain in business.

9.      At all pertinent times herein, Robert Day ("Day") was an individual who owned and operated a number of businesses located primarily in the Baton Rouge, Louisiana area.

10.      These various business entities engaged in the business of, amongst other things, commercial  and residential real estate development.

11.      For example, when Robert Day decided to construct condominiums in what would be referred to as "The Summit Project," Day incorporated a company to hold the land used in that project.  Similar arrangements were made for other development projects such as the project that would become known as "The Pelican."

12.     At all pertinent times herein, the Defendant, R.W. Day and Associates ("R.W.D.A.") was a company formed under the laws of the State of Louisiana which has its principal place of business in Baton Rouge, Louisiana.

13.     R.W.D.A. was responsible for the management and operations of the various other companies which were established and owned by Robert Day.   In addition, R.W.D.A was responsible for acquiring building material suppliers and other vendors for the various land development projects undertaken by the various commercial real estate development companies owned by Robert Day.

14.     In May of 2016, Day, in his individual capacity, began searching for building material systems to use in the commercial real estate development projects in which he and companies which he owned were involved.

15.     As part of these efforts, Day used a computer connected to a computer network to access and review the T.R.P. Ltd. website.

16.     After reviewing the T.R.P. Ltd. website, Day used information obtained from the website to contact T.R.P. Ltd.

17.     In May of 2016, Day called the offices of T.R.P. Ltd. in Radford, Virginia and represented himself as a real estate developer from Baton Rouge, Louisiana who was interested in buying Thermasteel building panels for both ongoing and future real estate development projects.

18.     Soon after this initial contact, Day began conversations with Ben-Senior, and learned that Ben-Senior was temporarily operating T.R.P. Ltd during Ben-Senior's efforts to purchase the company.

19.     Day also learned during these conversations with Ben-Senior that Ben-Senior was in need of capital to purchase T.R.P. Ltd.

20.     Day was aware that Ben-Senior was located in Virginia during these conversations, and that he, Day, was communicating with individuals located in Virginia for the purposes of purchasing goods that would be manufactured in, and distributed from, Virginia.

21.     During these conversations, Day informed Ben-Senior that he owned R.W.D.A., and that R.W.D.A. was primarily responsible for the procurement of the building products and other materials used in the various real estate development projects in which he was involved.

22.     Upon learning of the superior construction and desirability of the Thermasteel panels in commercial building, Day decided he wished to own and operate a manufacturing facility for the Thermasteel panels that would be located in or around Baton Rouge, Louisiana.

23.     As such, during the initial negotiations, Day requested that he be permitted to purchase machinery and other equipment from T.R.P. Ltd. such that he could build and operate his own manufacturing facility for Thermasteel panels in Louisiana.

24.     Ben-Senior refused Day's request.  Instead, Ben-Senior informed Day that, at most, he would agree to Day becoming an investor in Ben-Senior's purchase of T.R.P. Ltd.

25.     As a result, Day entered into negotiations with Ben-Senior, concerning providing Ben-Senior one or more loans in the aggregate amount of approximately $2 million such that Ben-Senior would have the capital necessary to buy T.R.P. Ltd.

26.     In return for the making of the loans, Day, or a business entity Day would incorporate to undertake the actual loaning of the monies, would ultimately receive a 38% share in the ownership of T.R.P. Ltd.

27.     In June of 2016, Day decided that he would form a single purpose entity for the loaning of the monies to Ben-Senior.  This single purpose entity would eventually be known as Tulip Thermasteel, LLC ("Tulip Thermasteel").

28.     The initial conversations between Day and Ben-Senior occurred both telephonically and through email communications.  Thus, Day intentionally used and operated a computer which was connected to, and part of, a computer network capable of accessing the internet to communicate with Ben-Senior with the knowledge that the computer receiving the emails Day transmitted was connected to this same computer network and was located within the confines of Virginia.

29.     As part of the negotiations concerning the loan of the $2 million, Day invited Ben-Senior and other persons who would work at Thermasteel once the company was formally incorporated to travel from Virginia to a meeting with Day and members of R.W.D.A.'s "design" team in Houston, Texas.  Once again, the details of this invitation were established through both verbal and email communications with Ben-Senior while Ben-Senior was located in Virginia.

30.     During this meeting in Texas, Day represented to Ben-Senior that once T.R.P. Ltd. was purchased through the use of the loaned monies, R.W.D.A., either

directly, or through the various companies owned by Day, would purchase at least $5 million in Thermasteel panels during the first year after the purchase of T.R.P. Ltd. was completed.

31.     Day further represented that R.W.D.A. would arrange for the purchase of further panels for new commercial real estate projects in which the companies Day owned and operated would be involved beyond the first year after which T.R.P. Ltd. was purchased.

32.     As the negotiations continued, Day invited Ben-Senior and his team to travel to Baton Rouge, Louisiana such that Ben-Senior could personally observe certain building projects owned by Day, or one of the various companies which he owned, and managed by R.W.D.A. that had already been completed or were in construction and for which Thermasteel panels would be purchased once T.R.P. Ltd. was acquired.

33.     During the Baton Rouge trip, Day first took Ben-Senior to observe a development project managed by R.W.D.A. known as the "Summit," and then a second real estate project operated and managed by R.W.D.A. known as the "Pelican."

34.     During the Baton Rouge trip, Day once again represented to Ben-Senior and the other members of Ben-Senior's team that once T.R.P. Ltd. was purchased, R.W.D.A., through Tulip Thermasteel, would purchase at least $5 million dollars' worth of building panels for use in Day's building projects during the first calendar year alone after the purchase.

35.     In addition, Day specifically represented to Ben-Senior that once T.R.P. Ltd. was purchased, R.W.D.A., through Tulip Thermasteel, would be ordering panels to finish both the Summit and Pelican building projects.

36.     At the conclusion of these two meetings, Ben-Senior and his team returned to Virginia.

37.     Each building project is unique in its construction, and as such, the Thermasteel panels that are to be used in any given project must be specifically designed and engineered to meet the load and bearing requirements of that particular building project.

38.     At Day's insistence, Ben-Senior and his team began work on engineering the panels that Tulip Thermasteel would purchase at the direction of R.W.D.A. once the purchase of T.R.P. Ltd. was completed.

39.     Robert Day was aware that these engineering efforts were to take place in Virginia. Similarly, R.W.D.A, the company that would ultimately direct Tulip Thermasteel in its purchase of the Thermasteel panels, was aware that these engineering efforts would occur in Virginia.

40.     Tulip Thermasteel agreed to advance working capital to be used in the design and testing of the Thermasteel panels, and thus, Tulip Thermasteel sent funds to Ben-Senior in Virginia.

41.     In July 2016, Day demanded Ben-Senior keep discussions of R.W.D.A.'s, Day's, and thus ultimately Tulip Thermasteel's, investment in the purchase of T.R.P. Ltd. private, and that Tulip Thermasteel be the only investor in the purchase of T.R.P. Ltd. other than Ben-Senior.

42.     During these negotiations, Day and a design team which worked primarily with R.W.D.A. traveled on at least two occasions to Radford, Virginia to tour

8

and otherwise inspect the T.R.P. Ltd. manufacturing facilities and to observe the testing on the sample panels.

43.     During these trips to Virginia, and thus while he was within the confines of the Commonwealth, Day repeated to Ben-Senior and other members of Ben-Senior's production and sales team the following representations:

a.   That Day was currently involved in a number of commercial real  estate projects in and around Baton Rouge, Louisiana; and

b.   That R.W.D.A was the operations and management company responsible for overseeing the various commercial real estate projects owned and operated by Day, or by single purpose entity companies owned by Day; and

c.   That either R.W.D.A directly, or through directing the single purpose entity Tulip Thermasteel, would purchase at least $5 million in Thermasteel panels for various construction projects such as "The Summit" and/or "The Pelican" during the first year after Tulip Thermasteel's investment with Ben-Senior; and

d.   That either R.W.D.A directly, or through directing the single purpose entity Tulip Thermasteel, would purchase additional Thermasteel panels for various construction projects after the first year of Tulip Thermasteel's investment; and

e.   That as a partial means of repaying any monies loaned to Thermasteel, R.W.D.A. would either directly purchase or direct Tulip Thermasteel to purchase Thermasteel panels at Thermasteel's cost to manufacture same

9

plus 20% of the manufacturing cost incurred by Thermasteel for said panel manufacturing

44.     At the time of making these representations and throughout all of these negotiations, Day was an officer, Director, and acting as an agent of both R.W.D.A. and Tulip Thermasteel.

45.     Day was present at the offices of R.W.D.A. during various telephone and email conversations with Ben-Senior, and Day was using email accounts owned and/or licensed by R.W.D.A when communicating with Ben-Senior electronically.

46.     In reliance on Day's representations that R.W.D.A., either directly or through Tulip Thermasteel, would purchase at least $5 million in Thermasteel panels in the first year after the purchase of T.R.P. Ltd. alone, Ben-Senior agreed to Day's requests and turned away other investors for the purchase of T.R.P. Ltd.

47.     At the insistence of Day made during these negotiations, Ben-Senior was to incorporate a company called Thermasteel, Inc. ("Thermasteel") for the purchase of T.R.P. Ltd, rather than buying the company himself.

48.     On August 25, 2016, relying on the representations of Day that Tulip Thermasteel would purchase millions of dollars of Thermasteel panels for the building projects managed by R.W.D.A., Ben-Senior created Thermasteel, Inc.

49.     On or about August 29, 2016, Day formally created Tulip Thermasteel, LLC ("Tulip Thermasteel"), the company that would ultimately loan Thermasteel the approximately $2 million necessary to purchase T. R.P. Ltd.

50.     At the time of the creation of Tulip Thermasteel, Day was also acting as the executor of the estate of his father, Jeptha Van Day ("J. V.'s Estate").

51.     The primary beneficiaries of J.V.'s Estate were Day's two daughters, namely Robin and Lauren Day.

52.     J.V.'s Estate created and wholly owned at the time a limited liability company known as Tulip, LLC ("Tulip").

53.     One of the purposes of Tulip was the management and investment of the monies contained in J.V.'s Estate.  Day was the sole manager of the operations of Tulip at the time.

54.     As part of his decision to loan monies to Ben-Senior, and ultimately Thermasteel, Day approached his daughters in the role of executor and financial administrator of J.V.'s Estate and obtained the agreement of both daughters that J.V.'s Estate should provide the funding for the loans and investments in Thermasteel.  Both daughters agreed to provide these funds.

55.     As executor of J.V.'s Estate, Day instructed Tulip to transfer, in various forms and at various times, approximately $2 Million in funds to Tulip Thermasteel.

56.     Having secured the needed monies to fund the loan to Thermasteel, Day, in his capacity as agent for Tulip Thermasteel, instructed his attorneys to begin drafting the needed documents to memorialize the business deal.

57.     In early September 2016, an original draft of the various documents Tulip Thermasteel wished to use to memorialize the loan were forwarded by Tulip Thermasteel to Thermasteel at Thermasteel's offices in Radford, Virginia.  Once again, these documents were being exchanged by means of a computer network utilizing the internet where at least one computer involved in the email exchanges was located in Virginia.

58.     On the eve of the signing of the original loan documents, negotiations between Thermasteel and Tulip Thermasteel soured to such an extent that the closing on the deal was cancelled.

59.     Thereafter, Ben-Senior, on behalf of Thermasteel, and Day, on behalf of Tulip Thermasteel, began renegotiating the terms of the agreement.

60.     Eventually, the parties reached a new agreement for the loan of approximately $2 million from Tulip Thermasteel to Thermasteel.  This new agreement was also based upon the representations that Day had made individually, on behalf of R.W.D.A, and on behalf of Tulip Thermasteel through the entire negotiating process.

61.     Day instructed Tulip Thermasteel's attorneys to memorialize this new agreement in various documents to be presented to Thermasteel at or before a new closing date for the new loan agreement.

62.     In reliance upon the representations of Day, Tulip Thermasteel, and R.W.D.A., on September 13, 2016, Thermasteel entered into a Loan Agreement with Tulip Thermasteel. A copy of the Loan Agreement is attached hereto as **Exhibit A**.

63.     The September 16, 2016 Loan Agreement did not accurately reflect the new agreement reached between Thermasteel and Tulip Thermasteel concerning the loan.

64.     For example, under the terms of the Loan Agreement, the monies loaned to Thermasteel by Tulip Thermasteel were to be secured by four promissory notes.

65.     The first promissory note was to be in the amount of $480,000.00 and would be repaid in periodic cash payments commencing January 2, 2019.

66.     The second promissory note was to be in the amount of $400,000.00 and would be repaid in periodic cash payments commencing January 2, 2019.

67.     The third promissory note was to be in the amount of $720,000.00 and would be repaid through the purchase of Thermasteel panels by Tulip Thermasteel at a price that was the cost of manufacturing the panels plus 20% of Thermasteel's cost of manufacturing the panels.

68.     The fourth promissory note was to be in the amount of $600,000.00 and would be repaid through the purchase of Thermasteel panels by Tulip Thermasteel at a price that was the cost of manufacturing the panels plus 20% of Thermasteel's cost of manufacturing the panels.

69.     Under the terms of this Loan Agreement, the monies loaned to Thermasteel were to be secured only by "granting a first priority security interest in all of the Corporation's [Thermasteel's] right, title and interest in and to all of the Corporation's personal property, including, but not limited to, all equipment, furniture, fixtures, inventory, accounts receivable, operating accounts, and general intangibles of the Corporation." Loan Agreement, Page 3, Paragraph 3.1.1.

70.     This Loan Agreement, as signed, did not mention securing the loan monies against any real property owned by Thermasteel.

71.     In reliance upon the representations of Day, Tulip and R.W.D.A., on September 13, 2016, in Radford Virginia, Thermasteel signed only two Promissory Notes in favor of Tulip Thermasteel, the first of which was for $1,140,000.00, and the second of which was for $760,000.00. A copy of the two Promissory Notes are attached hereto as **Exhibit B** and **Exhibit C**, respectively.

72.     Under the terms of the two Promissory Notes actually executed by Thermasteel, Thermasteel was to repay the amounts loaned in periodic cash payments, said payments to commence on January 2, 2019.

73.     The two Promissory Notes were secured by a Security Agreement and Deed of Trust ("Deed of Trust") which would be recorded against the real property housing the manufacturing plant of T.R.P. Ltd. which would be acquired as part of Thermasteel's purchase of that company. A copy of the Deed of Trust is attached hereto as **Exhibit D**.

74.     As part of the new loan agreement to fund the purchase of T.R.P. Ltd., and to induce Thermasteel to obtain this loan, Day and Tulip Thermasteel also agreed to provide funding for industry testing, the results of which were necessary for both Tulip Thermasteel's projects and contracts Thermasteel would have with other customers.

75.     In September of 2016, Thermasteel purchased T.R.P. Ltd., using the monies loaned to it by Tulip Thermasteel under the two Promissory Notes,

76.     Throughout the months of September to December 2016, the relationship between Tulip Thermasteel and Thermasteel began to break down and sour.

77.     Contrary to its representations that it would pay cost plus 20% for the Thermasteel panels it was to purchase through December of 2016, Tulip Thermasteel began efforts to force Thermasteel into selling the Thermasteel panels to Tulip Thermasteel at a price lower than the cost for Thermasteel to manufacture same.

78.     While Thermasteel wanted to appease Tulip Thermasteel to the extent it could, Thermasteel resisted Tulip Thermasteel's demands for Thermasteel to sell Thermasteel panels to Tulip Thermasteel at prices below those initially quoted and approved.

79.     During this period of time, Thermasteel had secured contracts to work on the design, testing, and manufacture of Thermasteel panels for other customers.

80.     Tulip Thermasteel was aware of the contracts between Thermasteel and these other customers, and was further aware that Thermasteel stood to receive revenues from the contracts with these customers once those contracts were completed.

81.     Tulip Thermasteel, through Day, pressured Thermasteel to stop working on other projects for other customers and focus on the development of the Thermasteel panels that would be used by Tulip Thermasteel, for the projects managed by R.W.D.A.

82.     At the direction of Tulip Thermasteel, Thermasteel began focusing all of its production efforts on engineering and testing the Thermasteel panels that Tulip Thermasteel was to purchase.

83.     Because of the pressure and time demands placed on Thermasteel by Tulip Thermasteel and Day, Thermasteel was incapable of working on other orders for other customers.

84.     Tulip Thermasteel and Day were aware that their demands on the time and resources of Thermasteel was preventing Thermasteel from completing orders for other customers.

85.     As a direct result of the demands and other interference by Tulip Thermasteel and Day, Thermasteel lost contracts for the supply of Thermasteel panels to customers other than Tulip Thermasteel and R.W.D.A.

86.     Due to Day and Tulip Thermasteel's demands upon the time and efforts of Thermasteel to the exclusion of other customers, at least one employee left the employ of Thermasteel.

87.     By the end of December 2016, Tulip Thermasteel was once again pressuring Thermasteel to open a manufacturing plant in Louisiana, such that R.W.D.A., directly, or through Tulip Thermasteel, might purchase Thermasteel panels at a much lower cost than what Thermasteel could offer.

88.     Thermasteel once again declined to open a manufacturing plant in Louisiana, but instead asked Tulip Thermasteel to continue to honor its agreement to purchase Thermasteel panels from Thermasteel at a price that was the cost of manufacturing the panels plus 20% of Thermasteel's cost of manufacturing the panels.

89.     When Thermasteel refused to sell Tulip Thermasteel panels at nothing more than cost of production, in February of 2017, Tulip Thermasteel, through its agent, Day, canceled further testing of the Thermasteel panels that were to be purchased for the Summit project.

90.     In March of 2017, Day and Tulip Thermasteel failed to provide the needed funding for the testing of the Thermasteel panels, and this failure made it impossible for Thermasteel to complete testing on both the panels Tulip Thermasteel was to purchase, but also production of the panels that were to be purchased by other customers.

91.     The lack of completed testing resulted in Thermasteel being unable to purchase materials, losing contracts, and being unable to bid on multiple new jobs.

92.     Tulip Thermasteel was aware that its failure to provide funding for testing would result in Thermasteel's inability to produce Thermasteel panels thereby making it impossible for Thermasteel to fulfill currently existing obligations to customers, and obtain future contracts for its products.

93.     Throughout the early months of 2017, Tulip Thermasteel had not placed any orders for Thermasteel panels as it had agreed to do.

94.     Instead, requests for Thermasteel panels were being made by R.W.D.A. directly through its employees.  These requests were being made by electronic mail transmission from the R.W.D.A. offices in Louisiana to computers at the Thermasteel plant in Virginia.

95.     When Tulip Thermasteel was alerted to the fact that it had ultimately agreed to be the entity to make the Thermasteel panel purchases, rather than R.W.D.A. directly, Day responded on behalf of Tulip Thermasteel that Thermasteel should fulfill the R.W.D.A. requests for panels as if the orders had been made by Tulip Thermasteel.

96.     As such, Tulip Thermasteel was acting as nothing more than a conduit, shell and/or alter-ego for R.W.D.A. concerning the purchase of the Thermasteel panels.

97.     In direct contravention of its earlier representations, and the representations of R.W.D.A., by Spring of 2017, Tulip Thermasteel informed Thermasteel that Tulip Thermasteel would not be purchasing any Thermasteel panels for the Summit Project, the Pelican Project, nor any other project operated or managed by R.W.D.A.

98.     The representations of Day and R.W.D.A. that R.W.D.A. would arrange for purchase of at least $5 million in Thermasteel panels for projects which R.W.D.A. managed were false when made, and Day, acting as the agent of R.W.D.A., knew that said misrepresentations were false at the time that the misrepresentations were made.

99.     The representations of Day as the agent of Tulip Thermasteel that Tulip Thermasteel would purchase at least $5 million in Thermasteel panels were false when made, and Day, acting as the agent of Tulip Thermasteel, knew that said misrepresentations were false at the time that the misrepresentations were made.

100.     The representations of Day as the agent of Tulip Thermasteel that Tulip would purchase at least $5 million in Thermasteel panels at a price of the actual cost of the manufacture of the panel plus 20% were false when made, and Day, acting as the agent of Tulip Thermasteel, knew that said misrepresentations were false at the time that the misrepresentations were made.

101.     Thermasteel relied upon the false and misleading statements of Day, R.W.D.A. and Tulip Thermasteel to its detriment, and as a direct result of the false and misleading statements of Day, R.W.D.A. and Tulip Thermasteel, Thermasteel and Ben-Senior have been financially harmed.

102.     Mistakenly believing that the two Promissory Notes actually executed by Thermasteel were governed by the terms of the Loan Agreement, and in an effort to cause acceleration of the amounts due under the two Promissory Notes, Tulip Thermasteel began to manufacture breaches of the terms of the Loan Agreement.

103.    For example, under the terms of the Loan Agreement, Thermasteel was to provide certain financial documents to Tulip Thermasteel after the end of each financial quarter commencing with September 30, 2016.

104.    Thermasteel only completed the purchase of T.R.P. Ltd. on September 13, 2016, and thus no financial activity existed for the company for the brief seventeen day period between September 13, 2016 and September 30, 2016.

105.    When this explanation was provided to Tulip Thermasteel, Tulip Thermasteel declared that the failure of Thermasteel to provide financial statements for these seventeen days constituted a breach of the Loan Agreement.

106.    On June 22, 2017, Thermasteel received correspondence from counsel for Tulip Thermasteel alleging this and further breaches of the terms of the Loan Agreement.  Counsel for Thermasteel received a copy of said correspondence on June 30, 2017.

107.    Further, Thermasteel disputes that the two Promissory Notes secured by the Deed of Trust conform to the terms of the Loan Agreement, and thus are not made under, nor governed by the Loan Agreement.

108.    On August 22, 2017, Thermasteel received correspondence from Virginia counsel for Tulip Thermasteel claiming that Thermasteel had breached the terms of the Promissory Notes as set forth in Tulip Thermasteel's counsel's previous letter of June 30, 2017, and further provided notice that should Thermasteel not provide all sums due and owing under the Promissory Notes, Tulip Thermasteel would be exercising its right to sell the real property securing the two Promissory Notes under the Deed of Trust.

109.     Tulip Thermasteel then set a foreclosure sale on the real property securing the two Promissory Notes for September 14, 2017.

110.     The real property which is the subject of the two Promissory Notes and the Deed of Trust is the primary manufacturing site for Thermasteel ("the Radford Thermasteel Plant").

111.     The sale of the Radford Thermasteel Plant would result in a complete cessation of all manufacturing and other business efforts of Thermasteel.

112. Ultimately the foreclosure sale was halted by injunction of the Radford City Circuit Court.

113.     The sale of the Radford Thermasteel Plant would work irreparable harm upon Thermasteel as it would forever destroy any possibility of Thermasteel operating and/or manufacturing the panels of the company.

## COUNT ONE – FRAUD IN THE INDUCEMENT
(Defendants: Robert Day; R.W. Day & Associates)

114.     The allegations in paragraphs 1 through 115 are hereby realleged and incorporated into Count One as if set out verbatim herein.

115.     Day, both individually and as the agent of R.W.D.A., represented to Ben-Senior, both individually initially, and later as the incorporator, and thus the agent, of Thermasteel, that R.W.D.A. would, either directly, or through a new single- purpose business entity known as Tulip Thermasteel, purchase millions of dollars in panels from Thermasteel once Thermasteel bought T.R.P. Ltd.

116.     At the time that Day, and thus R.W.D.A., made these representations to Ben-Senior, Day knew said representations to be false.

117.    Day and R.W.D.A truly wished to acquire the machinery used by Thermasteel to manufacture the Thermasteel panels such that this equipment could be relocated to Louisiana and used to manufacture panels for the various companies owned by Day at a cost lower than that offered by Thermasteel.

118.    This was the same desire Day and R.W.D.A requested when initially speaking to Ben-Senior, but which Ben-Senior refused.

119.    Neither Day nor R.W.D.A. truly wanted, nor intended, to actually purchase Thermasteel panels from Thermasteel, as doing so would have allowed Thermasteel to repay the loaned monies and avoid falling into a situation where Tulip Thermasteel could seize Thermasteel's assets.

120.    In direct reliance of the representations of Day, both individually and as the agent of R.D.W.A., Ben-Senior incorporated the company Thermasteel, borrowed funds from Tulip Thermasteel for the purchase of T.R.P. Ltd., refrained from seeking other investors to provide funds for the purchase of T.R.P. Ltd., purchased T.R.P. Ltd., began engineering and development of panels for use at development projects managed by R.W.D.A., refrained from obtaining work from other potential clients, and entered into Promissory Notes secured by the Radford Thermasteel Plant for repayment of the loaned monies.

121.    Ben-Senior and Thermasteel's reliance on the misrepresentations of Day, and thus R.W.D.A., was reasonable under the circumstances under which the misrepresentations were made.

122.     As a direct result of the false misrepresentation of Day, both individually and as the owner/agent of R.W.D.A., the Planitiffs have suffered, and will continue to suffer, damages.

WHEREFORE, the Plaintiffs demand judgment on this Count of the Complaint against Defendants Robert W. Day and R.W. Day & Associates, jointly and severally, in the amount of $2,000,000.00 together with attorney's fees and court costs.

A TRIAL BY JURY ON THIS COUNT IS HEREBY DEMANDED.

## COUNT TWO – FRAUD IN THE INDUCEMENT
(Defendants: Robert Day and Tulip Thermasteel, LLC)

123.     The allegations in paragraphs 1 through 122 are hereby realleged and incorporated into Count Two as if set out verbatim herein.

124.     Prior to the formal incorporation of Thermasteel, Day, as the agent of Tulip Thermasteel, represented to Ben-Senior, both individually and later as an incorporator of Thermasteel, that Tulip Thermasteel would purchase millions of dollars in panels from Thermasteel once Thermasteel bought T.R.P. Ltd.

125.     After the incorporation of Thermasteel by Ben-Senior, Day, as the agent of Tulip Thermasteel, represented to Thermasteel that Tulip Thermasteel would purchase millions of dollars in panels from Thermasteel once Thermasteel bought T. R.P. Ltd.

126.     At the time that Day, and thus Tulip Thermasteel, made these representations to Ben-Senior and later to Thermasteel, Day knew said representations to be false.

127.    Day and Tulip Thermasteel truly wished to acquire the machinery used by Thermasteel to manufacture the Thermasteel panels such that this equipment could be relocated to Louisiana and used to manufacture panels for the various companies owned by Day at a cost lower than that offered by Thermasteel.

128.    This was the same desire Day and R.W.D.A requested when initially speaking to Ben-Senior, but which Ben-Senior refused.

129.    Neither Day nor Tulip Thermasteel truly wanted, nor intended, to actually purchase Thermasteel panels from Thermasteel, as doing so would have allowed Thermasteel to repay the loaned monies and avoid falling into a situation where Tulip Thermasteel could seize Thermasteel's assets.

130.    In direct reliance of the representations of Day, as the agent of Tulip Thermasteel, Ben-Senior incorporated the company Thermasteel, Thermasteel borrowed funds from Tulip for the purchase of T.R.P. Ltd., Ben-Senior refrained from seeking other investors to provide funds for the purchase of T.R.P. Ltd., Thermasteel purchased T.R.P. Ltd., Thermasteel began engineering and development of panels for Tulip Thermasteel, and Thermasteel entered into Promissory Notes secured by the Radford Thermasteel Plant for repayment of the loaned monies.

131.    Ben-Senior and Thermasteel's reliance on the misrepresentations of Day, and thus Tulip Thermasteel, was reasonable under the circumstances under which the misrepresentations were made.

132.    As a direct result of the false misrepresentation of Day as the owner/agent of Tulip Thermasteel, the Plaintiffs have suffered and will continue to suffer damages.

WHEREFORE, the Plaintiffs demand judgment on this Count of the Complaint against Defendants Robert W. Day and Tulip Thermasteel, LLC, jointly and severally, in the amount of $2,000,000.00 together with attorney's fees and court costs.

A TRIAL BY JURY ON THIS COUNT IS HEREBY DEMANDED.

## COUNT THREE – INTERFERENCE WITH A BUSINESS EXPECTANCY
(Defendants: Robert W. Day and Tulip Thermasteel, LLC)

133.    The allegations in paragraphs 1 through 132 are hereby realleged and incorporated into Count Three as if set out verbatim herein.

134.    Day and Tulip Thermasteel were aware that the product testing it promised to fund was critical for Thermasteel to procure future contracts, and for Thermasteel's entry into more profitable commercial markets.

135.    Thermasteel's future contracts in the more profitable commercial markets were expected to result in future economic benefit to Thermasteel.

136.    Day and Tulip Thermasteel were aware that Thermasteel's future business in commercial markets hinged upon the completion of certain testing which Day and Tulip Thermasteel agreed to fund, and that upon the completion of this testing Thermasteel had a probability of receiving an economic benefit from their ability to acquire and fulfil these expected contracts.

137.    Tulip Thermasteel, knowing the impact that doing so would have on Thermasteel, withheld the funds necessary to fully complete the testing.

138.    Tulip Thermasteel's withholding of the funds necessary to complete the testing directly interfered with Thermasteel's ability to obtain business and realize a probable economic benefit from contracts into which Thermasteel could then enter.

139.    As a direct result of the withholding of funds to complete the critical testing, Thermasteel has been unable to bid on multiple projects, resulting in the termination of its business expectancy in this regard.

140.    Thermasteel has suffered, and will continue to suffer damages in profitability due to Day and Tulip Thermasteel's knowing efforts to fail to timely provide funding for the testing of the Thermasteel panels.

WHEREFORE, the Plaintiffs demand judgment on this Count of the Complaint against Defendants Robert W. Day and Tulip Thermasteel, LLC, jointly and severally, in the amount of $2,000,000.00 together with attorney's fees and court costs.

A TRIAL BY JURY ON THIS COUNT IS HEREBY DEMANDED.


### COUNT FOUR – INTERFERENCE WITH BUSINESS CONTRACTS
(Defendants: Robert Day and Tulip Thermasteel, LLC)

141.    The allegations in paragraphs 1 through 140 are hereby realleged and incorporated into Count Four as if set out verbatim herein.

142.    Thermasteel entered into various contracts and commitments with other customers besides Tulip Thermasteel, for the manufacturing of Thermasteel panels.

143.    Defendants Day and Tulip Thermasteel were aware of Thermasteel's other contracts and commitments to other customers for the production of Thermasteel panels.

144.    Day and Tulip Thermasteel used Tulip Thermasteel's financial position to demand that Thermasteel prioritize Tulip Thermasteel's projects, to the detriment of other contracts.

145.    Day and Tulip Thermasteel placed such continuous demands on Thermasteel that Thermasteel was not capable of fulfilling other orders and commitments to other customers of Thermasteel.

146.    As a result of the interference of Day and Tulip Thermasteel into Thermasteel's daily business activity, contracts for the provision of Thermasteel panels to other customers were canceled or otherwise lost.

WHEREFORE, the Plaintiff Thermasteel demands judgment against Defendants Robert W. Day and Tulip Thermasteel, LLC, jointly and severally, in the amount of $2,000,000.00 together with attorney's fees and court costs.

A TRIAL BY JURY ON THIS COUNT IS HEREBY DEMANDED.

## COUNT FIVE – CIVIL CONSPIRACY
(Defendants Robert W. Day; R.W.D.A. and Tulip Thermasteel, LLC)

147.    The allegations in paragraphs 1 through 146 are hereby realleged and incorporated into Count Five as if set out verbatim herein.

148.    The misrepresentation of Day, R.W.D.A. and Tulip Thermasteel were designed to induce Thermasteel into borrowing monies to purchase T.R.P. Ltd. under terms of a loan that the conspirators knew Thermasteel could never satisfy.

149.    R.W.D.A. was the business entity truly responsible for the decisions concerning the purchase, or lack thereof, of the Thermasteel panels and was directing the actions of Tulip Thermasteel in this regard.

150.    The decision not to purchase the Thermasteel panels was that of Day and R.W.D.A. and this decision was simply communicated to Thermasteel and otherwise orchestrated by Tulip Thermasteel.

151.     By never intending to buy the millions of dollars in Thermasteel panels as promised, Day, R.W.D.A., and Tulip Thermasteel conspired to cause Thermasteel to default on the terms of the loan between Thermasteel and Tulip Thermasteel thereby in effect forcing Thermasteel out of business and allowing Tulip Thermasteel to seize the manufacturing equipment and machines of Thermasteel to relocate same to Louisiana.

152.     Day, R.W.D.A., and Tulip Thermasteel furthered their conspiracy against Thermasteel by convincing Ben-Senior not to procure other investors in the project who might supply funds to repay the loan, and by tortuously interfering with existing business contracts and other business expectancies of Thermasteel which could have resulted in profits which Thermasteel could then have used to repay the loan to Tulip Thermasteel.

153.     The actions of Day, R.W.D.A were unlawful and/or illegitimate and were designed to harm Thermasteel and its business interests.

154.     As a direct result of the conspiratorial acts of Day, R.W.D.A., and Tulip Thermasteel, Thermasteel and Adi Ben-Senior have and continue to suffer damages.

155.   The actions of Day, R.W.D.A., and Tulip Thermasteel were willful and intentional and were designed to harm Adi Ben-Senior as well as Thermasteel and its business interests.

WHEREFORE, the Plaintiffs Thermasteel and Adi Ben-Senior demand judgment against Defendants Robert W. Day and Tulip Thermasteel, LLC, jointly and severally, in the amount of $2,000,000.00 together with attorney's fees and court costs.

A TRIAL BY JURY ON THIS COUNT IS HEREBY DEMANDED

## COUNT SIX – BUSINESS CONSPIRACY

### (Defendants Robert W. Day; R.W.D.A., and Tulip Thermasteel, LLC)

156.    The allegations in paragraphs 1 through 155 are hereby realleged and incorporated into Count Six as if set out verbatim herein.

157.    The misrepresentation of Day, R.W.D.A., and Tulip Thermasteel were designed to induce Thermasteel into borrowing monies to purchase T.R.P. Ltd. under terms of a loan that the conspirators knew Thermasteel could never satisfy.

158.    R.W.D.A. was the business entity truly responsible for the decisions concerning the purchase, or lack thereof, of the Thermasteel panels and was directing the actions of Tulip Thermasteel in this regard.

159.    The decision not to purchase the Thermasteel panels was that of Day and R.W.D.A. and this decision was simply communicated to Thermasteel and otherwise orchestrated by Tulip Thermasteel.

160.    By never intending to buy the millions of dollars in Thermasteel panels as promised, Day, R.W.D.A., and Tulip Thermasteel conspired to cause Thermasteel to default on the terms of the loan between Thermasteel and Tulip Thermasteel in effect putting Thermasteel out of business and thereby allowing Tulip Thermasteel to seize the manufacturing equipment and machines of Thermasteel to relocate same to Louisiana.

161.    Day, R.W.D.A., and Tulip Thermasteel furthered their conspiracy against Thermasteel by convincing Ben-Senior not to procure other investors in the project who might supply funds to repay the loan, and by tortuously interfering with existing business contracts and other business expectancies of Thermasteel which could

have resulted in profits which Thermasteel could then have used to repay the loan to Tulip Thermasteel.

162.    The actions of Day, R.W.D.A., and Tulip Thermasteel were unlawful and/or illegitimate and were designed to harm Thermasteel and its business interests.

163.    The actions of Day, R.W.D.A., and Tulip Thermasteel were willful and intentional and were designed to harm Thermasteel and its business interests.

164.    As a direct result of the conspiratorial acts of Day, R.W.D.A., and Tulip Thermasteel, Thermasteel has and continues to suffer damages.

WHEREFORE, the Plaintiff, Thermasteel, Inc. demands judgment against the Defendants Robert W. Day, and Tulip Thermasteel, LLC, jointly and severally, for treble its damages pursuant Va. Code Section §18.2-500 in the amount of at least $2,000,000.00 together with attorney's fees and court costs.

A TRIAL BY JURY ON THIS COUNT IS HEREBY DEMANDED

WHEREFORE, the above premises considered, the Plaintiff's request the following relief from this Court:

A.    That this Court find for the Plaintiff, Adi Ben-Senior in the amount of $2,000,000.00 together with attorney's fees and court costs, against Defendants Robert W. Day, and R.W. Day & Associates, jointly and severally, on the basis of Fraud in the Inducement; and

B.    That this Court find for the Plaintiffs, Thermasteel, Inc. and Adi Ben-Senior, in the amount of $2,000,000.00, together with attorney's fees and court costs, against the Defendants Robert Day and Tulip Thermasteel, LLC jointly and severally, on the basis of Fraud in the Inducement; and

  C.  That this Court find for the Plaintiff Thermasteel, Inc. in the amount of $2,000,000.00, together with attorney's fees and court costs, against the Defendants Robert Day and Tulip Thermasteel, LLC, jointly and severally, on the basis of Interference with a Business Expectancy; and

  D.  That this Court find for the Plaintiff Thermasteel, Inc. in the amount of $2,000,000.00, together with attorney's fees and court costs, against the Defendants Robert Day and Tulip Thermasteel, LLC, jointly and severally, on the basis of Interference with Business Contracts; and

  E.  That this Court find for the Plaintiffs, Thermasteel, Inc. and Adi Ben-Senior, in the amount of $2,000,000.00, together with attorney's fees and court costs, against the Defendants Robert W. Day, R.W.D.A., and Tulip Thermasteel, LLC, jointly and severally, on the basis of Civil Conspiracy; and

  F.  That this Court find for the Plaintiff Thermasteel, Inc. in the amount of $2,000,000.00, together with attorney's fees and court costs, against the Defendants Robert W. Day; R.W.D.A. and Tulip Thermasteel, LLC jointly and severally, on the basis of Business Conspiracy; and

  G.  For any and all other further relief as this Court deems meet and just.

  A TRIAL BY JURY IS HEREBY DEMANDED

    THERMASTEEL, INC.

    By:/s/ Timothy S. Bird
        Counsel


    By:/s/ Richard D. Scott
        Counsel

Timothy S. Bird (Va. Bar No. 38139)
Sarah Bidwell (Va. Bar No. 92108)
Gilbert, Bird, Sharpes & Robinson
310 S. Jefferson Street
Roanoke, Virginia 24011
(540) 721-5110
(540) 721-5112 (Facsimile)
tsbird@gilbertbird.com
Special Counsel for Thermasteel, Inc.

Richard D. Scott (Va. Bar No. 44527)
Law Office of Richard D. Scott
302 Washington Avenue SW
Roanoke, VA  24016
(540) 400-7997
(540) 491-9465 (Facsimile)
richard@rscottlawoffice.com
Bankruptcy Counsel for Thermasteel, Inc.

ADI BEN-SENIOR

By:/s/ Timothy S. Bird

Timothy S. Bird (Va. Bar No. 38139)
Sarah Bidwell (Va. Bar No 92108)
Gilbert, Bird, Sharpes & Robinson
310 S. Jefferson Street
Roanoke, Virginia 24011
(540) 721-5110
(540) 721-5112 (Facsimile)
tsbird@gilbertbird.com
Counsel for Adi Ben-Senior